1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                               DISTRICT OF NEVADA

8                                      * * *
                                        )
9    ROYAL BRADFORD KEIFE,               )
                                         )
10                Plaintiff,             )        3:10-cv-0546-LRH-VPC (base)
                                         )        3:11-cv-0916-LRH-VPC (member)
11   v.                                  )
                                         )
12   METROPOLITAN LIFE INSURANCE         )        ORDER
     COMPANY,                            )
13                                       )
                  Defendant.             )
14   _____)

15         Before the court is defendant Metropolitan Life Insurance Company's ("MetLife") motion

16   for summary judgment against plaintiff Royal Bradford Keife ("Keife"). Doc. #136.[1]

17         Also before the court is MetLife's motion for summary judgment against plaintiff

18   Brenda J. Simon ("Simon"). Doc. #141.

19   **I.     Facts and Background**

20         This consolidated class-action litigation involves alleged breaches of life insurance policies

21   issued by defendant MetLife through the Federal Employees Group Life Insurance ("FEGLI")

22   Program.

23         The FEGLI Program was established in 1954 by Congress with the passage of the Federal

24   Employees Group Life Insurance Act ("FEGLIA"), found at 5 U.S.C. § 8701, *et seq*. Pursuant to

25

26   _____
     [1] Refers to the court's docket number.

FEGLIA, defendant MetLife and the United States Civil Service Commission, which has been succeeded by the United States Office of Personnel Management ("OPM"), entered into a contract under which MetLife became responsible for providing life insurance to civilian employees of the federal government. This contract between the federal government and MetLife, referred to as the FEGLI Policy,[2] took effect in 1954 and has been amended seventy-six (76) times.

To carry out its administrative obligations under the FEGLI Policy, MetLife established the Office of Federal Employee's Group Life Insurance ("OFEGLI"). In 1994, OFEGLI began paying FEGLI Policy benefits through the use of Total Control Accounts ("TCAs") issued in the beneficiary's name. The TCA is MetLife's version of a retained asset account: an interest-bearing account on which the beneficiary may write drafts. The assets backing the TCA liabilities are held in MetLife's general investment account.

**A. Royal Bradford Keife v. MetLife, case no. 3:10-cv-0546**

Non-party Betty May Keife, a civilian employee of the federal government, had a $12,750 life insurance policy with MetLife under the FEGLI Program. Plaintiff Keife was the named beneficiary under that policy.

On February 28, 2008, Betty May Keife died. In March 2009, Keife contacted MetLife about the policy and MetLife sent Keife a claims folder which provided that if the benefit amount equaled or exceeded $5,000.00 a TCA would be opened in his name and a book of drafts would be mailed to him. On or about March 16, 2009, Keife executed and submitted the completed claims form. Doc. #136, Exhibit 2.

On April 2, 2009, MetLife established Keife's TCA, earning .5% interest, in the amount of $12,959.09.[3] Keife closed his TCA in July 2009, by writing himself a draft for the full account

---

[2] A copy of the FEGLI Policy is attached as Exhibit 1 to MetLife's motion for summary judgment. Doc. #136, Exhibit 1.

[3] The amount initially credited to Keife's TCA includes the $12,750 in death benefits plus 1.5% delayed settlement interest earned on the benefits from the date of Betty May Keife's death in February 2008.

1  balance.

2          Subsequently, on July 30, 2010, Keife filed the present class action complaint against

3  MetLife. Doc. #1, Exhibit 1. In the complaint, Keife alleges that MetLife breached the FEGLI

4  Policy by failing to pay the death benefits as required under the policy. *Id*. Keife filed a second

5  amended complaint on September 21, 2010. Doc. #12, Exhibit 1. The second amended complaint

6  alleged four causes of action: (1) breach of contract; (2) breach of fiduciary duty; (3) breach of

7  duties arising from confidential relationships; and (4) breach of the covenants of good faith and fair

8  dealing. *Id*.

9          On October 18, 2010, the parties stipulated to the dismissal of Keife's second, third, and

10  fourth causes of action. Doc. #24. MetLife then filed a motion to dismiss Keife's remaining cause

11  of action for breach of contract. Doc. #27. On April 27, 2011, the court denied MetLife's motion to

12  dismiss finding that Keife had sufficiently alleged that MetLife failed to pay the death benefits

13  pursuant to the FEGLI Policy. Doc. #52.

14          On May 4, 2012, MetLife filed the present motion for summary judgment. Doc. #136. Keife

15  filed an opposition (Doc. #147) to which MetLife replied (Doc. #150).

16      **B.  Brenda J. Simon v. MetLife, case no. 3:11-cv-0916**

17          Non-party Brian Simon, a civilian employee of the federal government, had a $534,000 life

18  insurance policy and a $99,000 accidental death policy with MetLife under the FEGLI Program.

19  Plaintiff Simon was the named beneficiary under those policies.

20          On May 28, 2010, Brian Simon died. In June 2010, Simon contacted MetLife about the

21  policies and MetLife sent Simon a claims folder which provided that if the benefit amount equaled

22  or exceeded $5,000.00 a TCA would be opened in her name and a book of drafts would be mailed

23  to her. In June 2010, Simon executed and completed the claims forms.

24          On July 13, 2010, MetLife established Simon's TCA, earning .5% interest, in the amount of

25

26

$535,009.58.[4] After the TCA was established, Simon submitted an accidental death benefit claim. MetLife credited Simon's TCA with an additional $99,398.75.[5] Simon then proceeded to write over thirty drafts on the account for varying amounts over the next several months.

On November 3, 2011, Simon filed a class action complaint against MetLife for breach of contract. *See* Doc. #1, Case no. 3:11-cv-0916-LRH-VPC. In the complaint, Simon likewise alleges that MetLife breached the FEGLI Policy by failing to pay the death benefits as required under the policy. *Id.* Two months after filing her complaint, in January 2012, Simon closed her TCA by writing herself a draft for her remaining account balance.

On December 28, 2011, this separately filed class action was consolidated into the Keife action. Thereafter, MetLife filed a separate motion for summary judgment. Doc. #141. Simon filed an opposition to the motion (Doc. #148) to which MetLife replied (Doc. #150).

## II.   Legal Standard

### A.   Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

///

---

[4] The amount initially credited to Simon's TCA benefits includes the $534,000 in death benefits plus 1.5% delayed settlement interest earned on the death benefits from the date of Brian Simon's death on May 28, 2010.

[5] The additional amount credited to Simon's TCA benefits includes the $99,000 in accidental death benefits plus 1.5% delayed settlement interest earned on those benefits from May 28, 2010.

4

1    The moving party bears the burden of informing the court of the basis for its motion, along

2    with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,

3    477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party

4    must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

5    find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.

6    1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

7         To successfully rebut a motion for summary judgment, the non-moving party must point to

8    facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson*

9    *Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the

10   outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

11   (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is

12   not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material

13   fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for

14   the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of

15   evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute;

16   there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

17   **B.  Contract Interpretation**

18        Under Nevada law, insurance policies are contracts, which must be enforced according to

19   their terms. *Continental Cas. Co. v. Summerfield*, 482 P.2d 308, 310 (Nev. 1971). The starting

20   point for the interpretation of any contract is the plain language of the contract. *McDaniel v. Sierra*

21   *Health and Life Ins. Co., Inc.*, 53 P.3d 904 (Nev. 2002); *see also, Klamatch Water Users Protective*

22   *Ass'n v. Patterson*, 20 F.3d 1206, 1210 (9th Cir. 1999) ("Whenever possible, the plain language of

23   the contract should be considered first."). When a contract contains clear and unequivocal

24   provisions, those provisions shall be construed to their usual and ordinary meaning. *Dickenson v.*

25   *Nevada*, 877 P.2d 1059, 1061 (Nev. 1994). Then, using the plain language of the contract, the court

26

shall effectuate the intent of the parties, which may be determined in light of the surrounding

circumstances. *See 2 NGA #2 Ltd. Liab. Co. v. Rains*, 133 Nev. 1151, 1158 (1997); *see also,*

*Burrows v. Progressive Casualty Ins.*, 820 P.2d 748, 749 (Nev. 1991); *Klamatch Water Users*,

20 F.3d at 1210 ("Contract terms are to be given their ordinary meaning, and when the terms of a

contract are clear, the intent of the parties must be ascertained from the contract itself.").

**III.    Discussion**

To prevail on their breach of contract claims plaintiffs must demonstrate: (1) the existence

of a valid contract; (2) a breach of that contract by the defendant; and (3) damages resulting from

defendant's breach. *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006); *Brown*

*v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008).

In addressing the initial motion to dismiss in the Keife action, this court has already found

that the FEGLI Policy is a valid contract. Doc. #52. Thus, the issues remaining before the court are:

(1) whether defendant MetLife breached the FEGLI Policy by crediting plaintiffs' death benefits to

a TCA, and (2) if there was a breach, whether plaintiffs suffered damages. The court shall address

each issue below.

**A.  Breach**

In their complaints, plaintiffs allege that MetLife breached Section 5 of the FEGLI Policy

by crediting their benefits to a TCA rather than paying the entirety of their benefits with a single

check.

Section 5 of the FEGLI Policy governs the payment of death benefits and states:

> Section 5. INSURING CLAUSES – (A) Life Insurance – Upon receipt by the
> Office of satisfactory proof, in writing, that any Employee shall have died while
> insured hereunder, the Office shall pay, subject to the terms hereof, the amount of
> Life Insurance, if any (plus interest, if any, as determined by the Insurance Company)
> in force hereunder on account of such Employee in accordance with Section 4 hereof,
> at the date of his death. *Payment shall be made to the Beneficiary of record of the*
> *Employee* or otherwise as provided in Section 11 hereof *immediately after receipt of*
> *such proof and of proof that the claimant is entitled to such payment*.

Doc. #136, Exhibit 1, Section 5 (emphasis added).

Under the plain language of Section 5, MetLife is obligated to pay benefits immediately and in one sum after receiving a completed claims form. In its motions for summary judgment, MetLife contends that it met these obligations by opening TCAs in plaintiffs' names and crediting the full value of their benefits, plus interest, to their accounts. *See* Doc. ##136, 141. In support of its motions, MetLife makes three specific arguments. First, MetLife argues that by crediting plaintiffs' benefits to a TCA and providing plaintiffs a draft booklet upon which to draw on those funds, it paid the death benefits in accordance with the payment provisions of Section 5 of the FEGLI Policy. Second, MetLife argues that its payment of plaintiffs' benefits was both immediate and in one sum because plaintiffs' TCAs were opened after receiving all completed claims forms and were credited with the full amount of plaintiffs' benefits. Finally, MetLife argues that even if using a TCA does not constitute payment under Section 5 of the FEGLI Policy, plaintiffs Keife and Simon agreed to an alternative form of payment pursuant to Section 20 of the policy thereby precluding the underlying claims for breach of contract. Each argument is addressed below.

### 1. Payment

Section 5 of the FEGLI Policy provides that "[p]ayment shall be made . . . after receipt . . . of proof that the claimant is entitled to such payment." Doc. #38, Exhibit A. Although Section 5 provides that payment must be made, the provision does not specify the form payment must take, and the term payment is not defined anywhere in the FEGLI Policy. Further, there are no examples of how payment may be made under the policy, or what type of action would not constitute payment under the policy terms. Because the term payment is not defined, and is "reasonably susceptible to more than one interpretation," it is an ambiguous term within the FEGLI Policy. *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003).

When a contract term is ambiguous, the court should construe the term in accordance with the intent of the parties. *See 2 NGA #2 Ltd. Liab. Co.*, 133 Nev. at 1158. Under Nevada law, the intent of the parties may be explained or supplemented by the parties' course of performance. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 538 (9th Cir. 2011). Here, the court has reviewed

the documents and pleadings on file in this matter, as well as the arguments of counsel at the December 10, 2012 hearing, and finds that the intent of the parties to the FEGLI Policy (the United States and MetLife) as explained and supplemented by their nearly twenty year ongoing course of performance was to include MetLife's use of TCAs, or similar retained asset accounts, as an authorized form of payment under Section 5.

First, payment is simply the "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation." *Black's Law Dictionary* (9th ed. 2009). A similar broad and general interpretation of payment is important in this action because the FEGLI Policy has been in effect since 1954 and the court can easily identify different payment methods that have become acceptable in society with new technological advancements. In addition to checks, payment has taken a variety of continually evolving forms including paper currency, banknotes, credit cards, stored payment cards, wire transfers, electronic funds transfers, and retained asset accounts. Limiting the term payment to only a single check unreasonably narrows the meaning of the term payment in Section 5.

Second, the court finds that there is no evidence that the term payment was meant to be construed or limited to a single check payment. In contrast, the evidence before the court supports a definition of payment which includes the use of retained asset accounts like MetLife's TCAs. Specifically, the parties to the FEGLI Policy expressly authorized MetLife to pay benefits through the use of TCAs in a series of letters addressing the use of TCAs for FEGLI Policy beneficiaries. The first letter, written on September 30, 1993, stated that OPM had "approved the use of [TCAs] for FEGLI beneficiaries" under certain conditions. *See* Doc. #136, Exhibit 3a. The second letter, written November 23, 1993, stated that MetLife was "authorized to begin using [TCAs] for paying FEGLI beneficiaries . . . effective January 3, 1994." *See* Doc. #136, Exhibit 3b. Moreover, OPM helped draft and approved all variations of the FEGLI claim form (which identifies the use of a TCA) and drafted a handbook identifying the use of TCAs as a payment method. *See* Doc. #136, Exhibit 2, Claims Form; Exhibit 4, FEGLI Handbook.

Additionally, since MetLife began using TCAs in 1994, the United States has consistently determined that MetLife has met its payment obligations under the FEGLI Policy by using TCAs. For example, the Office of the Inspector General ("OIG") regularly audits the FEGLI Program every two years. In every audit since 1994, OIG has found that MetLife's claims payment process complies with the FEGLI Policy. *See e.g.* Doc. #136, Exhibit 12, OIG Final Audit Report for Fiscal Years 2007-2008, July 20, 2010 ("Our review of the benefit payments paid by MetLife on behalf of FEGLI participants showed that the benefits were paid in accordance with [the FEGLI Policy] as well as the applicable Federal regulations."). Further, the United States Government Accountability Office ("GAO"), performed an audit and report of MetLife's TCA process in 2012. The GAO's report found that MetLife satisfies its obligations under the FEGLI Policy when it "makes claims payments by establishing guaranteed accounts in beneficiaries' names." Doc. #136, Exhibit 13, GAO Report 2012. This course of conduct is determinative of the parties' intent and establishes that the United States has authorized the use of TCAs as an acceptable form of payment for FEGLI Policy benefits. Accordingly, the court finds that MetLife did not breach Section 5 of the FEGLI Policy by paying plaintiffs' benefits through the use of TCAs.

In opposition, plaintiffs contend that even if the term payment is not limited to a single check payment, crediting a TCA still does not constitute payment under the FEGLI Policy because FEGLI beneficiaries do not have control and possession over the funds in their TCAs. Plaintiffs argue that possession and control of the life insurance benefits is retained solely by MetLife and that until a beneficiary draws on the account, the funds represented by the account are not in the beneficiary's possession. *See e.g., Mogel v. UNUM Life Insurance Co.*, 547 F.3d 23, 26 (1st Cir. 2008) ("The difference between delivery of a check and a checkbook . . . is the difference between UNUM retaining or UNUM divesting possession of Plainitff's funds. . . .  Until a beneficiary draws a check on the Security Account, the funds represented by that check are retained by UNUM and UNUM has the use of the funds for its own benefit."). Thus, plaintiffs argue that crediting a TCA

///

1  does not constitute payment of the death benefits and, as such, MetLife still breached the FEGLI
2  Policy. The court disagrees.
3       First, plaintiffs' reliance on the First Circuit's decision in *Mogel* is misplaced. In *Mogel*, the
4  First Circuit determined that plaintiff life insurance beneficiary had a viable claim for breach of
5  fiduciary duty under the Employment Retirement Income Security Act ("ERISA"), 29 USC §1001
6  *et seq.*, where defendant UNUM's policy language required specific disbursements of benefits. In
7  contrast, the FEGLI Policy does not contain such limiting language, nor are the present breach of
8  contract actions based under ERISA. Thus, the First Circuit's decision in *Mogel* is inapplicable in
9  this action.
10      Second, the court finds that the undisputed evidence establishes that plaintiffs had control
11  over the funds in their TCAs. For example, the 2012 GAO report found that FEGLI beneficiaries
12  "have full and immediate access to their funds and can withdraw some or all of the funds at any
13  time without any penalty." Doc. #136, Exhibit 13, GAO Report 2012. Further, plaintiffs' deposition
14  testimony establishes that they had access and control over the money in their TCAs. In particular,
15  plaintiff Simon's testimony confirms that she had immediate access and control over her funds
16  once she received the draft book. *See* Doc. #141, Exhibit 25, Simon Depo. at 101:8-12 ("Q. Okay.
17  And they told you that you could access your money immediately if you want to? A. They said, you
18  can write checks, Ms. Simon, any time you would like. I said, Okay, then I'm on the road.").
19  Moreover, upon receiving the draft book, plaintiff Simon wrote over thirty (30) different checks
20  during the life of her TCA to pay various bills, repay loans, purchase goods, and make investments.
21  Similarly, plaintiff Keife testified that he had access over the money in his TCA, but made a
22  conscious decision to not withdraw those funds to prevent commingling the benefits with other
23  funds from his mother's estate. *See* Doc. #136, Exhibit 21. Thus, plaintiffs had access to and
24  control of the funds in their TCAs.
25       **2. "Immediately" and "In One Sum"**
26       In their complaints, plaintiffs also contend that MetLife breached Section 5 of the FEGLI

10

Policy by failing to pay their benefits "immediately" and "in one sum." The court has reviewed the documents and pleadings on file in this matter and finds that MetLife paid the death benefits "immediately" and "in one sum."

First, it is undisputed that MetLife's payment was immediate because upon receiving the completed claim forms, MetLife opened plaintiffs' TCAs and notified plaintiffs that they could access their accounts upon receiving the draft book. Further, the 2012 GAO report found that MetLife's payment of the benefits was "immediate." Doc. #136, Exhibit 13, GAO Report 2012. Therefore, MetLife paid the death benefits "immediately" as required by Section 5.

Second, MetLife also paid the death benefits "in one sum." Payment is made "in one sum" when the entire quantity of money owed is paid in one transaction, rather than in installments. Here, it is undisputed that MetLife credited the entire amount of death benefits to plaintiffs when it established their TCAs. Thus, MetLife also paid plaintiffs' death benefits "in one sum" in accordance with the FEGLI Policy.

### 3. Alternative Settlement

In its motions for summary judgment, MetLife argues in the alternative that even if crediting a TCA does not constitute payment under Section 5 of the FEGLI Policy, it still did not breach the FEGLI Policy because the plaintiffs agreed to an alternative form of payment in settlement of death benefits pursuant to Section 20 of the FEGLI Policy. The court agrees.

Section 20 of the FEGLI Policy, entitled Optional Modes of Settlement, provides that "[a]fter the death of an Employee, arrangements may be made whereby the amount of insurance due at the death of the Employee will be paid in a manner other than in one sum to the Beneficiary or other person entitled to receive payment." Doc. #136, Exhibit 1, Section 20. Here, the undisputed facts establish that alternative arrangements were made between MetLife and both plaintiffs Keife and Simon when they executed and submitted the completed claims forms which stated in clear and plain language that payments would be made through a TCA. *See e.g.* Doc. #136, Exhibit 2, Claims Form. Further, plaintiffs concede that they signed the claims forms

1   allowing for the opening of a TCA. Finally, at no time did plaintiffs request payment by check or
2   some other form of payment other than the identified TCA. The court finds that, assuming a TCA is
3   not an appropriate payment method under Section 5, plaintiffs agreed to payment through a TCA
4   and therefore, MetLife still did not breach the FEGLI Policy.

5   **B.  Damages**

6   An essential element of a breach of contract claim is a showing that the defendant's alleged
7   breach caused damages to the plaintiff. *Saini*, 434 F. Supp. 2d at 919-920. In their complaints,
8   plaintiffs contend they were damaged because their payments were "delayed" from the time the
9   TCA was created until it was closed. Because their payments were "delayed," plaintiffs contend
10  they are entitled to the delayed settlement interest provision under Section 4 of the FEGLI Policy
11  from the date their TCAs were opened until the date they were closed.

12  The court disagrees and finds that plaintiffs have not established that they were damaged by
13  MetLife's use of TCAs. First, as addressed previously in this order in evaluating whether MetLife
14  breached the FEGLI Policy, the court found that plaintiffs were paid when the TCA was opened.
15  Thus, payment was not delayed and plaintiffs were not damaged. Second, Section 4's delayed
16  settlement provision is not applicable in this action. Plaintiffs' damages argument is built on the
17  flawed assumption that Section 4 of the FEGLI Policy is a liquidated damages provision. It is not.
18  Rather, the purpose of Section 4 of the FEGLI Policy is to compensate beneficiaries for delayed
19  access to their benefits that inevitably results from the claims administration process and to provide
20  an incentive to MetLife to pay individual death benefits quickly. Here, in accordance with this
21  provision, MetLife paid the 1.5% delayed settlement interest on plaintiffs' benefits from the date of
22  death of the insured employees until the date on which their death benefits were credited to their
23  TCAs. As such, plaintiffs received all the delayed settlement interest to which they were entitled in
24  this case. Therefore, the court finds that plaintiffs were not damaged by MetLife's use of TCAs to
25  pay life insurance benefits. Accordingly, the court shall grant MetLife's motions for summary
26  judgment.

1          IT IS THEREFORE ORDERED that defendant's motions for summary judgment

2   (Doc. ##136, 141) are GRANTED.

3          IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of

4   defendant Metropolitan Life Insurance Company and against plaintiff Royal Bradford Keife in case

5   no. 3:10-cv-0546-LRH-VPC.

6          IT IS FURTHER ORDERED that the clerk of court shall enter judgment in favor of

7   defendant Metropolitan Life Insurance Company and against plaintiff Brenda J. Simon in case no.

8   3:11-cv-0916-LRH-VPC.

9          IT IS SO ORDERED.

10         DATED this 8th day of March, 2013.

11
                                          _____
12                                        LARRY R. HICKS
                                          UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22

23

24

25

26

                                          13